UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARNETTA FOSTER,

    Plaintiff,

v.

ILLINOIS DEPARTMENT OF HUMAN SERVICES,

    Defendant.

No. 15 C 7655

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Charnetta Foster alleges that her former employer, a division of the Illinois Department of Human Resources, fired her in retaliation for making a complaint about sexual harassment. The Department has moved for summary judgment. R. 64. For the following reasons, the Department's motion is granted.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th

Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Background**

Foster began working as a "mental health tech trainee" at the Ann Kiley Center in April 2014. R. 72 ¶ 5. Kiley is a center for people with special needs operated by the Illinois Department of Human Resources. Kiley contains about 50 homes housing about seven to ten people each. *Id.* ¶ 6. Foster worked in these homes cooking and cleaning and helping the residents travel to work and medical appointments. *Id.* ¶ 7.

Foster was a "trainee" and not a "certified employee." *Id.* ¶ 10. This meant that she was not eligible to be a member of the union for certified mental health technicians. *Id.* ¶¶ 10-11.

Foster developed a relationship with Destiny Hughes, a certified employee who had worked at Kiley for eight years. *Id.* ¶¶ 14, 19. The precise nature and course of their relationship is disputed. Foster contends that the relationship was only a friendship. R. 75 ¶ 9. However, it is undisputed that they exchanged text messages of a romantic nature. R. 72 ¶ 20. Hughes testified that the relationship was sexual. *See* R. 75 ¶ 9. Foster testified that Hughes gave her gifts, including flowers and a watch. *Id.* ¶¶ 5-6.

In the early morning of September 21, 2014, Hughes sent Foster text messages calling Foster derogatory names. *Id.* ¶ 11. Hughes testified that she sent the

2

messages because she had learned that Foster was in a relationship with another person. *Id.*

That same day, Foster and Hughes argued about the text messages and engaged in a physical altercation. R. 72 ¶¶ 24-25. The fight occurred in the presence of a Kiley resident. *Id.*

After the fight, Foster and Hughes gave statements to Craig Smith, Kiley's residential services supervisor. *Id.* ¶ 33. In her statement to Smith, Foster wrote that the fight occurred because of Hughes "liking me and since she can't have me because I don't date women she gets upset when men say anything to me." R. 66-7 at 3. Foster admits that she never complained of sexual harassment to [Smith] before or after" the fight with Hughes. R. 72 ¶ 39.

Later that day, Foster and Hughes also gave statements to John Meade, the Department's Internal Security Investigator assigned to Kiley. In the written statement Foster gave Meade, she alleged that Hughes had harassed her. Foster wrote:

> I have not been in any sexual relationship with [Hughes] ever. She has sent me flowers . . . and she also has bought me a watch which I didn't accept. She has become obsessive with me and I've deleted her on facebook because of excessive [messages] being sent to me. She has started rumors of us dating each other and she has told me she didn't tell anyone we were dating. Despite the rumors I remained to be her friend [sic]. . . . I've been harassed and I thought I could get her to stop and she just wouldn't stop.

R. 66-8 at 1, 4. Meade testified that he did not understand Foster's statement to be a harassment complaint, but merely an explanation for the fight. R. 72 ¶ 45. Foster

admits that she never reported Hughes's alleged harassment prior to the fight even though she was aware she could have. R. 72 ¶¶ 35, 47.

The Department has a "zero tolerance policy relative to violence of any kind, including verbal or nonverbal threats, and related actions directly or indirectly perpetrated against any employee or visitor to [Kiley]. Any such action by an employee of [Kiley] shall result in his/her automatic discharge from employment." R. 72 ¶ 62. Both Foster and Hughes were fired. R. 72 ¶ 52. As a union member, Hughes had the right to appeal her termination. *Id.* Her termination was reversed through the union grievance process. *Id.*

## Analysis

Foster alleges that she was fired in retaliation for reporting sexual harassment to Meade. "To survive summary judgment on a Title VII retaliation claim, an employee must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018). Courts must "consider the evidence as a whole and conduct a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?'" *Id.* (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016), *cert. denied,* 137 S. Ct. 1115 (2017)).

## A. Protected Activity

The Department argues that Foster's statement to Meade did not constitute a complaint of sexual harassment protected by Title VII. To be protected by Title VII, a plaintiff must have acted with "a sincere and *reasonable* belief that he is opposing an unlawful practice." *Lord*, 839 F.3d at 563 (emphasis in original). "The objective reasonableness of the [plaintiff's] belief" is assessed by examining "whether the complained-of conduct entailed a motive that Title VII prohibits." *Id*. The Department argues that Foster has failed to produce evidence both: (1) that her relationship with Hughes was "of a sexual nature," R. 65 at 7; and (2) can be "labeled . . . as harassment," *id*. at 8.

First, the Department contends that Foster's claims are merely based on excessive social media communications and gifts, and that "[n]one of these incidents indicate [Foster] was being harassed because of her sex or describe harassment of a sexual nature in any way." R. 65 at 7. The Department cites *Lord v. High Voltage Software* in which the Seventh Circuit drew a line between "sexual horseplay" and "sex discrimination," explaining that the fact that sex is the subject of harassment does not necessarily mean that the defendant harassed the victim because of her sex. 839 F.3d at 562. (In *Lord*, the male plaintiff complained that his male co-workers teased him about his romantic interests and touched private parts of his body.) But the Department also concedes that Foster "engag[ed] in a consensual relationship with Hughes that had soured." R. 65 at 7; *see also id*. at 2 ("Some of the text messages sent by Plaintiff to Hughes were amorous in nature[.]"). Clearly, the Department

5

believes that there is sufficient evidence for a reasonable jury to find that Foster and Hughes's relationship was of a sexual nature.

The Department highlights the sexual nature of Foster and Hughes's relationship to argue that it was consensual such that Foster could not have had an objectively reasonable belief that Hughes had harassed her. *See* R. 65 at 7-8. But Foster has testified that she did not have a consensual sexual relationship with Hughes. This evidence is sufficient to establish a material dispute as to whether the relationship was consensual or constituted harassment.

**B.    Causation**

Nevertheless, even assuming that Foster's complaints about Hughes's conduct were protected activity, she also must be able to show that she was fired because of her complaints. *See Lord*, 839 F.3d at 563 ("But even if we assume that Lord's complaints about workplace harassment were protected activity, he has not shown that he was fired *because of* those complaints."). "A retaliation claim requires proof of causation, which in this context means but-for causation." *Id.*

It is undisputed that Foster was fired in the context of having engaged in a physical altercation with another Kiley employee in the presence of a Kiley resident. It is also undisputed that the Department's policy calls for termination under such circumstances. Had only Foster been fired, that might be sufficient evidence for a reasonable jury to find in her favor. But both Foster and Hughes were fired in the wake of their altercation. There is simply no evidence that the Department's contention that the altercation was the basis for the termination is pretextual. Foster

6

merely cites the timing of her complaint and termination. But the fact that the altercation occurred prior to Foster's complaint supports the Department's case. Considering the Department's policy and the egregious nature of Foster's conduct, no reasonable jury could find that she was fired for any other reason.

## Conclusion

For the foregoing reasons, the Department's motion for summary judgment, R. 64, is granted.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: November 28, 2018